Good afternoon, and may it please the court. My name is Cliff Gardner, and I represent the petitioner Ron Smith in this case. I'll be reserving five minutes of my time for rebuttal. The clerk has advised me that I should be my own best timekeeper, and I'll give it my best effort. I'd like to focus my remarks today on three of the issues in the briefs, particularly the ineffective assistance of counsel in connection with the guilty plea. I'd like to spend just a moment or two on one of the procedural issues the court asked for briefing on, that is the application of AEDPA, and then, time permitting, a comment or a few remarks on the skipper issue involving the exclusion of mitigating evidence. I first argued this case 20 years ago, Ron Smith's case, and in that 20-year period, in that 20-year argument 20 years ago, and in the briefing leading up to this argument, there were many sharp disagreements that my colleagues from the Montana Attorney General's office have, and I have, and I thought it might be useful today in connection with the guilty plea to start with two legal principles on which I think we agree, because it puts our differences on prejudice and on the performance prong of Strickland in context. And the first is a legal point that the State makes in its brief, and I agree with this legal point, and that is that a properly informed defendant can plead guilty to an offense, a homicide, or even a capital homicide. I agree with that, and there's a, I won't call it a competing principle, but there's a corollary principle that says if the defendant is not properly advised of a defense that applies in his case and which reasonably competent counsel should be aware of, then there's a problem with a plea in any case, and certainly a capital case. And that, of course, is probably where the agreements end and where the disagreements begin and where our argument begins. And the first question, of course, is was the defendant properly advised of the intoxication or mental health and mitigated homicide defenses? I don't think there's a great deal of dispute on it, but there is some. And in fact, the State's brief suggested that a petitioner is relying on, I think they put it, a silent record. And my point here today, this afternoon, is that nothing could be further from the truth. In fact, the record isn't silent as to whether a petitioner was advised of these defenses. We know he wasn't, and we know it from defense counsel himself. At the evidentiary hearing, defense counsel was asked what defenses did he waive? And it was a couple-page colloquy, and eventually the answer came out, he waived a defense regarding Rod Monroe's complicity in one of the homicides. That's the defense the petitioner was advised about. The contemporaneous record, that hearing was in 1992, the contemporaneous record, back in 83 when this all happened, when the change of plea happened, trial counsel prepared a letter for petitioner to send to trial counsel. And the idea behind this letter was to memorialize exactly what was said. And the letter appears at page 103 of the clerks of the supplemental except of record filed by the State in this case. And in that letter, counsel, in an effort to memorialize the advice given to his client, says here's the statutes and the legal materials I provided the client so he's aware of things.  What's not in there is the statute that talks about intoxication as a defense under Montana law, the statute that talks about mental health as a defense under Montana law, and the case of State v. Azure which talks about mitigated homicide. So it's fairly clear that these defenses were not defenses petitioner was advised of. That brings us to the second point of disagreement, and this is a much sharper point of disagreement. And that is, should reasonably competent counsel have advised petitioner of these defenses? And let me step back and say, the fact that a defense exists is not enough to support a Strickland claim. Ultimately, counsel has to be, there have to be facts that put counsel on notice that he or she should investigate this or advise the client. I concede that. And so we need to look at the facts here and say, should reasonably competent counsel, not Strickland doesn't say counsel handling your first capital case, reasonably competent counsel have been aware that these defenses existed. And let me, and were applicable in this case, and let me break it down into two separate categories, the law and the facts. In terms of Montana law, and this is sort of important, and I think it's a problem that the district court had. Montana law changed in 1987. It changed significantly. In this, of course, the crime occurred in the early 80s, and so the pre-87 law was applicable. And, of course, that 1987 change went all the way to the United States Supreme Court in Montana v. Echelhoff. But ultimately, this is pre-1987 law. And in that scenario, under Montana law, intoxication could be a defense to deliberate homicide, mental health could be a defense to deliberate homicide, and mitigated homicide as a lesser was also possible, given a combination of intoxication and severe emotional distress. So that's the legal framework that reasonably competent counsel is going to have going into this case. And here's what we know trial counsel knew. We know he knew from his early meetings with his client that his client had a history of drug and alcohol abuse. We know that he had a conversation with the client's family, and they said this started when he was 11 or 12 years old. It included methamphetamine, heroin, and LSD. We know that his client told him that on the day of the offense, and there's a little dispute in this record because trial counsel is deposed, and then he testifies at the evidentiary hearing. So we have two records. And at the deposition, he said, here's what I knew. I knew he had a six-pack of beer before the crime. He had a couple of drinks at the bar, and then the crime occurred. And at the evidentiary hearing, he said, well, I think he had a couple of drinks at the bar, and he might have told me about an LSD tablet the day before. So he knows that there's some amount. The exact amount, and there's nothing nefarious about the different recollections. This is just the way, as the Court is aware, witnesses, when you testify a second and a third time, the recollection changes a bit. I'm not suggesting there's anything nefarious. What I am suggesting, though, is that in light of the fact that intoxication is a defense under Montana law, when you know your client is an alcoholic, and when you know he's consuming LSD, heroin, methamphetamine, and when you know he's at a bar shortly before the crime, drinking, you are noticed to at least look into intoxication. So, too, with mental health. Could I stop there, not to jump ahead, but let's assume that that failure to investigate and then advise with respect to both intoxication and mental health would have given him a credible defense, or at least should have put the lawyer on notice. My question then goes to prejudice in that regard, because it seems to me that, as I understand Montana law, and I'm sure that you'll make sure that we have it right, the mental state and the intoxication go to whether the jury could determine that he had the requisite mental state. In other words, was he purposeful in knowing in terms of the commission of this crime? And we have quite a recitation of the record here from the trial court in Montana and various findings. So, in light of that, maybe you could begin to address prejudice, and I think I'll probably have some additional questions on prejudice. Sure. And let's back up and talk about what the prejudice inquiry is in a situation where the client has pled guilty. I mean, it's ultimately governed by Hill v. Lockhart, and ultimately the question, the Strickland prejudice component as applied to a guilty plea case is, would the client have not pled guilty and gone to trial had he or she been advised of the available defenses? So that's the question. And the first part of the answer, I think, is to look at why he pled guilty, because ultimately if a client pleads guilty and says, look, I don't care if I have defenses, I could have great defenses, I'm pleading guilty because in the eyes of God I did it and this is what I want, there can be a good argument that it doesn't matter what the defenses are. They have nothing to do with his rationale for pleading guilty. But that's not what we have here. What we have here is a fairly clear record from both petitioner and from trial counsel that the reason he pled guilty was because in his view, in his words at the deposition, there were, quote, no other options, end quote. And I think early on in the 1983 proceedings what he said was, he said, look, I thought this case was, quote, an automatic guilty, end quote. And it wasn't an automatic guilty. Trial counsel basically reiterated the same thing. When asked, you know, when he pled guilty, he pled guilty after being advised there were no viable defenses. But there were viable defenses. But you can't just, it's not simply his after the fact subjective statement on that. Don't you have to then meld that back into, you know, what legitimate advice would have been given in terms of the viability of those particular defenses? Well, I think the viability of the defense does have a role to play in this respect and it doesn't have a role to play in a second respect. And let me take the second respect first. It doesn't have a role to play in the sense of the Hill inquiry is directed at, would it have changed his mind in terms of going to trial? The Hill inquiry is not directed at, well, if he had gone to trial, would that have been a successful defense? That's a straightforward Strickland inquiry that we would conduct in a regular ineffective assistance of counsel claim and we would look to see, is our confidence in the outcome of trial undermined? Would the trial results have been different? That's not what we're looking at here.  Nevertheless, as I said, I think Your Honor is right. There is a component of viability in that, in the sense that if counsel advises you, you know, we've got this defense. There's not a one in a million chance, but it's technically available. The odds are, is he going to change his mind? I think the answer in that situation is no. So viability of the defense does have a role to play in assessing whether the client would have changed his mind. Well, given that and then given the facts where you have, at least as recited by the trial court, quite a purposeful, clear individual who the trial court labeled as minimally, I think the word that the trial court used was minimally impaired. How do those facts then tie into would he have in the hypothetical? Well, you know, of course, the phrase using the benefit of it, but counsel didn't have the benefit of that trial court finding when he would have been advising his client. He would have been in the situation of being, okay, let me just lay out Montana law. Montana law, my client, is that if you're intoxicated and you can't form the purposeful or knowing intent required, mental state required, that can be a complete defense. And under state versus azure, we know that even if it's not a complete defense, if you're operating under emotional stress and you're intoxicated, that can be a partial defense, mitigated homicide. And the sentence to mitigated homicide can be as little as two years. Then the question is, well, turn to viability. Well, what are my chances of getting those things? And had counsel done the workup, and we didn't get to talk a little bit about some of the performance things in connection with mental health, but had counsel done the workup, had he gotten an investigator and a waiver and gotten all the old records? I think the advice he would have given his client was, I don't know if we can get a unanimous jury to exculpate you on intoxication or mental health. We may get one or two jurors to hang, which is all we need. And we have a very good chance of the mitigated homicide defense under state versus azure. This case looks even stronger than state versus azure. So in terms of, again, we wouldn't have had the benefit of various rulings over the years as to what courts found. But in terms of what counsel is looking at prospectively, had counsel done the investigation, I think that's pretty close to the advice that would have been given. And you layer that on, given that we know why he pled guilty, there were no other options, and it was an automatic guilty. And I think the easy answer is, could counsel have told him there were other options? Yes. Could counsel have told him it wasn't an automatic guilty? Yes. And once those answers are there, then his rationale for pleading guilty drops, and the Hill versus Lockhart test is satisfied. Let me then, you know, unless the Court has other questions on prejudice or the performance prong, I'll move on to some of the other issues. Let me spend a moment on the AEDPA issue that the Court asked for briefing on. Before we move to that, I was surprised that when Smith changed his mind, the attorney didn't seek to withdraw the plea. Now, is that a problem for the State? That seems to be real incompetence of counsel. Well, I'm surprised by it, too. And I think the answer is, even at that point, counsel wasn't aware that these defenses could have applied.  And once he started amassing all this evidence of intoxication and mental health, it shows that, really, these defenses, which, you know, I'm a California lawyer. I found them without a problem. These defenses that should have been, you know, patently aware to an experienced or objectively reasonable Montana lawyer, the fact that a motion wasn't made right then seems to me to really support the idea that counsel not only didn't advise him of these defenses, but may not even have been aware of them. So, yes, I think it is a problem. Let me then turn to the AEDPA issue for just a moment. The facts of this case, just in a nutshell, it's a pre-AEDPA petition. It's practically a pre-habeas petition. It's so old. It's a pre-AEDPA petition. It's held in abeyance, and it's amended post-AEDPA. Now, this Court has addressed this on, I think it's six occasions. I've cited the cases. And in all those occasions, the ruling is it's a pre-AEDPA case. Now, this, I should back up and say this issue, however the Court resolves it, has no impact on the ineffective assistance of counsel claim because that's been pending in federal court since the late 80s. So we're only talking about the sentencing issues. But the Court has already addressed this issue in six cases. And the State makes a contrary argument, and they cite, I think, Anthony v. Canberra and Felix v. Mayo. And indeed, those cases apply post-AEDPA law to a post-AEDPA amendment. The problem, of course, is that both cases, the original habeas petition was filed post-AEDPA. So they were post-AEDPA cases from the inception. And that's why those cases really have no control here. The Court has addressed this on six occasions, and it's a pre-AEDPA case. There are really some good sound policy reasons for it, but in light of the law of the circuit doctrine, I don't think the Court needs to expend a great deal of judicial energy on it. So let me then turn to the mitigation issue. And that, of course, involves the exclusion of evidence at the sentencing phase. And the evidence at issue was offered by counsel was the results of sentences imposed in, I think, 28 other cases, in which defendants did not receive the death penalty. They got life. And let me, you know, I understand the hurdles to this. Do we look at the cases where it wasn't imposed or the cases where it was imposed, or do we look at both? Well, in terms of the mitigation issue presented here, the only mitigation issue presented was, was this evidence excluded, properly excluded? And this evidence was simply 28 cases where it wasn't imposed. Now, we could certainly talk about what, you know, I think a correct proportionality review should do. I think a correct proportionality review should do both. But we're not here to talk about that. I'm sure the Court isn't interested at all in my views on proportionality as a consequence. So the question really — The Supreme Court did a proportionality review on the death-imposed cases. Yes, it did. It did. And that's in accord with Montana law. So there are various proportionality statutes around the country. Some require the reviewing courts to look at both. Some require the reviewing courts just to look at other cases in which death was imposed. Why isn't that a function for appeal and not for the sentencing entity? And I say that because, of course, Montana had judge sentencing up until recently. How would one present this type of evidence to a jury? You know, I think you would present this evidence to a jury the same way you would present it to a judge. You could call witnesses, review the cases, and you could introduce testimony that way. I concede that in a case with jury sentencing, it might be a more problematic mechanism. You might have to devise, think a little harder about a mechanism to introduce this evidence. But ultimately, the question of admissibility doesn't depend on how easy it is to introduce. And the question is, is this evidence mitigating? Because if not, then it doesn't belong in judge or jury sentencing. And, of course, the State's position is that it doesn't relate to the defendant or the crime, and therefore it's not mitigating. And our position is that, while I appreciate that position, that's not the definition of mitigating evidence. And Skipper, Skipper says it's a very broad definition. Skipper says the definition of mitigating evidence is evidence that might lead to a sentence less than death. And McCoy, a few years later, says mitigating evidence is evidence that could reasonably be deemed to have mitigated. And so then the question is, okay, does this evidence, could it lead to a sentence less than death? So what do we do with, as a panel, what do we do with Beardsley? Well, I think, you know, I look at Beardsley and I look at Parker v. Duggar. And I think if the State's reading of Beardsley is correct, then it's inconsistent with Parker, which is why I think the State's reading of Beardsley isn't correct. Beardsley was a case in which that kind of evidence. That means you have to read Parker, then, to be sort of the whole enchilada comes in. And any means any, in effect. Well, as long as the evidence is. There's a relevant relationship. Exactly. There's an evidence relationship. Exactly. A relevant relationship. And in Beardsley there wasn't. And there wasn't for a very good reason in Beardsley. Two of the people in Beardsley as to whom defense counsel wanted to introduce the evidence had been acquitted of the crime for which defendant was sentenced to death. And it seems patently clear, at least to me, that evidence that someone who was acquitted of the crime and, therefore, not sentenced to death, isn't particularly probative as to someone who was convicted of the crime. It's hard for me to imagine a less similarly situated defendant. And, in fact, that's what Beardsley said. Beardsley, in describing this evidence, I think correctly summarized that these people weren't similarly situated. And so that would always be a legitimate evidentiary ruling that a trial court could make in terms of keeping evidence out. But that's not what happened here. This was a blanket ruling that this evidence isn't mitigating. And, of course, under the definitions in Skipper and McCoy, it is mitigating. We don't have to rely, fortunately, on just my interpretation of whether it's mitigating under Skipper and McCoy because we can look at Parker that said this evidence was mitigating evidence of non-death imposed on other defendants. And we can look at the Nebraska statute that requires the trial level sentencer to consider this kind of information. And one of the things that's interesting, I know... Nebraska? You mean Montana? Montana? No, actually, I do mean... Are you talking about Parker? No, I mean the Nebraska statute. It came out of the blue, didn't it? I'm sorry. Yeah, okay. Just give us a context. Yes. Where am I? No. Nebraska has a death penalty statute and it... A number of states. Yes. But with this kind of an issue. Yes, and not only with this kind of an issue, the Nebraska statute explicitly tells the trial level sentencer that it must consider sentences on similar cases where defendants received life. So the idea, and I rely on Nebraska, not because I'm from Nebraska. I mean, it's a perfectly fine state. I rely on Nebraska to say my position is that Skipper, the Skipper definition is that this might lead to a sentence of less than death. We have a state legislature that has recognized this kind of evidence can lead to a sentence less than death because they put it in their mitigation statute. That's why I pulled Nebraska out of thin air. But not only Nebraska. I think in the brief I cited six or seven other state cases where, in fact, state courts have given life precisely because of this kind of evidence. And I cite them not as precedent in the sense that the court is somehow bound by them, but I cite them as precedent for the idea that this evidence is relevant evidence. Ultimately, our death penalty jurisprudence requires us to try to figure out who's the worst of the worst and what's the worst of the worst crimes. And at least one relevant facet to this is trying to figure out does the crime itself deserve death. And that's why you can look, or that's why these jurisdictions, including Parker, including these six states, including Nebraska, have looked at exactly this kind of evidence. And they have uniformly said, yes, this is relevant to the decision. Not determinative and not irrebuttable, but relevant. And that's really what Skipper and McCoy are about. So unless the court has questions, any other questions about the performance problem or prejudice, I'm prepared to, pending my rebuttal, submit it. Very good. Thank you, Your Honor. Mr. Fowler. May it please the Court. I'm Mark Fowler, Assistant Attorney General for the State of Montana, here today to ask for you to please affirm the two judgments of Judge Lovell from 1993 and 2007 and dismiss the petition in its entirety. This has been a very long case, and it's a highly complex case. I admit that my colleague has framed in his opening statements the issues for this court in somewhat of a helpful manner in that especially in regard to the first issue he raises about ineffectiveness of counsel, it does come down to your determination essentially what the record actually reveals. I have some disagreement with my colleague about the nature of the Hill v. Lockhart standard, but essentially the facts will reveal in this case. Number one, the attorney, Gary Dorn, did not say that his client was waiving only one defense. The record reveals that when the portion that Mr. Gardner is referring to is when Mr. Dorn was cross-examined, I believe by Mr. Jackson, who is here today, about of the defenses you discussed with your client, if anything, do you recall what specific defense was it? Do you have any specific recollections of specific defenses? After 10 years testifying, his recollection was somewhat vague about the exact discussions about the different defenses discussed. The only thing that came to mind was the discussion briefly with Mr. Smith about the possibility of claiming that the co-defendant, Rod Monroe, was responsible for the killings that was discussed with Mr. Smith by Mr. Dorn and then both agreed to drop that line of inquiry, that line of defense. The other disagreement the State has with the characterization of the record is, and it is a pertinent question to ask, is what did Mr. Dorn know and when about possible defenses? But I need to underscore that it remains the petitioner's burden to show not that a defense existed, which of course would, you know, win an acquittal. Fair enough, the characterization of the law is, however, that you might show is viable, that there's some chance of success. Your Honors, nothing in this record shows there was any viable defense. Judge Lovell expressly stated so. No viable defenses existed. No exculpatory facts existed. We know there was apparently no independent investigation by Dorn. Your Honor, the State disagrees with respect. Judge Lovell found, in fact, there was an investigation. The independent investigation was that Mr. Dorn did consult and interview independently five, four to five witnesses who were on the 33 witness list from the FBI. Mr. Dorn did consult with the family members of Mr. Smith regarding his background, psychological background, his education, and other facets. So to the degree that is not established in the record that there was no independent investigation. As a matter of fact, Judge Lovell's determination. But it wasn't much. He's got six hours of his bill, and he said he might have spent more time on it. But in comparison with what would be done under today's standard, it's pretty paltry. Your Honor, to some extent, the characterization of paltry is now completely without merit. Even Judge Lovell recognized that. But the charge that his hours spent were six hours, only six hours, was dismissed by Judge Lovell, dismissed in terms of the finding of Judge Lovell was that did not accurately reflect how many true hours Mr. Dorn spent. The jailer that was brought to the federal hearing, evidentiary hearing, that oversaw Mr. Smith's time in the jail, Flathead County, testified that Mr. Dorn was in the jail every day. Mr. Dorn testified that when he was at the Flathead County Jail visiting other clients, he would always stop by and see Mr. Smith. He saw Mr. Smith every time that he was at the jail, at least a minimum once a week, sometimes three times a week. They discussed the case and spent hours discussing the matters, far more than is reflected in the timesheets, of course, because he received a flat salary fee for his services and he's not a good timekeeper and also admitted he's not a very good note taker as well. So his notes that are in this record don't accurately reflect all of the work that he did on this case. And Judge Lovell's determination is not clearly erroneous. He didn't ask for a psychiatric examination. Did he ask? He did not. He did not ask because nothing was apparent to him under his reasonable professional judgment that would have allowed him to pursue that line of inquiry. My esteemed colleague states that, well, Mr. Dorn was on notice. Again, that comes back to the central factual issue before this Court. What did he know and when? Mr. Dorn reasonably relied upon his observations, his professional judgment, stating he did not have background in psychological, psychiatric evaluation or diagnosis. Nevertheless, there's not been a court case, to my mind, under the stricter analysis that requires such a matter or requires that, regardless of what the client states for purposes of guilt phase, that a counsel to be reasonably effective under the Constitution must order a psychological evaluation. Well, here this individual was, in effect, asking for suicide. Doesn't that raise a little heckle? With respect, no, I disagree with that, asking for suicide. He was asked in 1995 in the sentencing hearing if this was not tantamount to suicide. No. I knew what I was doing. This was not. I sought the death penalty for specific reasons. In his 1993 deposition, which was admitted as part of the evidentiary record, he distinguished it as not an effort at suicide. He affirmed the letter of instruction that Gary Dorn had first handwritten and then typed as the specific instructions of the letter, the letter of instruction, of course, was some weeks before he pled guilty, indicating to Dorn, do not interfere with my efforts to plead guilty. Twice that letter of instruction talks about you have discussed the defenses with me. Two times it states that. Mr. Smith did not back off of that letter of instruction. Let's stop there. Of course, Mr. Smith's not a lawyer, so when he said you've discussed the defenses with me and then we don't have Mr. Dorn saying he discussed what might be the most obvious defenses, can we read anything into the client's statement that he discussed the defenses with me? If I understand your question correctly, Your Honor, I think you're asking to what degree does this court put an emphasis on what Smith may or may have known? Correct. I mean, there's really nothing in the record that suggests that the most important possible defense, which would have been this voluntary, the intoxication and mental state defense, that that was discussed with him as an option, that he might qualify for that and that might actually net him a different result. Is there anything in the record on that point? There is not. No. The answer is no. There is not specific detailed information from Mr. Dorn regarding the exact things he spoke about. But he did state essentially, and Mr. Smith, after many conversations, agreed, there were nothing to pursue, there were no options, there were no defenses that were available to him. Now, what does that mean in its entirety and the exact conversations that occurred? We do not know an answer to your question directly. We do not know exactly. And to a certain extent, the State is relying upon the presumption of Strickland that Mr. Dorn did render effective assistance to counsel and that would include properly advising his clients on all the possible and all the defenses that were under law and then what was available under the facts. But simply put, you look at the record now, there are no available defenses. And I'd like to address that directly first with the Azure case. The Azure case does not stand for the proposition that the Montana Supreme Court put any imprimatur on the role of a voluntary intoxication or drug ingestion as available for mitigated deliberate homicide. It cannot be read for that. The Azure case was based upon the revised code of Montana, which was changed in 1980. Regardless of what the status of mitigated deliberate homicide is, Your Honors, the law has been since and before that time that mitigated deliberate homicide is available to show where there is evidence existing of extreme emotional stress that for which there is a reasonable explanation or excuse. Okay. Mr. Smith has not produced any evidence of extreme emotional stress and that is specifically before Judge Lovell 1993 in the federal evidentiary hearing would like to point out on the record that that hearing states at the very end and it otherwise indicates in the pleading record that Mr. Smith was afforded independent psychiatric help and assistance in that federal evidentiary hearing. Could I just stop there because it seems, if I understood correctly, there's really two distinct defenses that might have been offered here. One, the mitigated deliberate homicide that you're referring to now. And then the defense that his state of mind or his circumstances were such that he couldn't really purposely or knowingly commit the crime. Do you see those as two separate defenses? Two possible lines of inquiry for you to analyze and to stricter analysis. Right. So you're speaking now really of the extreme emotional distress and the mitigated homicide defense, right? Yes. Separate from what he might have had independently because of his drug and alcohol use? I can speak to either one, Your Honor. Okay. Mr. Smith's position has some weight if you accredit Mr. Smith's testimony. Well, Mr. Smith's testimony was not accredited. As a matter of fact, Judge Lovell stated that in his order of 1993 that he believed that Mr. Doran and the response witnesses were credible. And I would submit and suggest to you there is an implicit finding there that, by contrast, Mr. Smith and his witnesses were not credible regardless of what that may be. The determination was made by Judge Lovell strictly on this factual matter of which side to believe. Well, Judge Lovell accredited Mr. Doran, who stated, and nothing else contradicts this in the record, that he did not and was not told of this information about the level of intoxication that was revealed after Mr. Smith pled guilty. Sure. But part of the problem, I think, and the Azure case hits on it, is that if you don't inform the client of the potential defenses, the client then can't marshal the facts to respond to them. That's where the touchstone of Azure that, in fact, the client wasn't informed of the differences between mitigated deliberate homicide and deliberate homicide. So shoehorning that back into this, the argument would be that if Doran had said, here's the difference between mitigated deliberate homicide and homicide, then Smith might well have told him what he said later about the amount of consumption. That would be the argument. Your Honor, the argument, with respect, is flawed for one major reason. There is nothing in this record when Smith was given an opportunity in 1993 to even talk about what he may have wanted to do if properly advised. Did not state, although given the opportunity, that I would have insisted on going to trial. He never backs off his statements that, as he states in the federal evidentiary hearing in his deposition, there was no question, and speaking of the time before he pled guilty in his conversation with Doran, there was no question as to my guilt. I'm almost exactly quoting that from memory. There was no question of my guilt. That wasn't the issue. When given the opportunity, as 1993 federal evidentiary, he had, never states, with all this information that was available to you, would you have insisted on going to trial? Would you not have pled guilty? The question wasn't posed. It was represented by Mr. Jackson, who I'd say is one of the best criminal defense attorneys in Montana. And the reason why it wasn't posed by Mr. Jackson is because the response would not have been given. And there is no. Now, the state is not relying upon some argument that there has to be these magic words by the defendant, that I would not have pled guilty. No, I think where we started this colloquy was when you said he didn't, Smith didn't tell him until later that he'd had this amount to drink. And my response to that, or at least the hypothetical response, is yes, but that if you apply the Azure case, and if counsel had informed him of the difference between mitigated deliberate homicide and deliberate homicide and what perhaps might be argued to be mitigated deliberate homicide, that he might well at that point have disclosed this additional information. You always put the state in a troubling position because we don't have a record, which is Mr. Smith's burden to produce, that it wasn't spoken of. We have in the record that Mr. Doran stated, I discussed all the offenses with him, and we have an established record that Mr. Smith stated under oath during his plea colloquy, the offenses were discussed, defenses were discussed. But we don't have a record of exactly if, in answer to your honest question, this distinction between the mitigated deliberate and deliberate homicide was expressly spoken. In the absence of that, the state must rely upon its argument that in the face of a solid record, the presumption still maintains under Strickland that that conversation did take place. Now, what I'm proposing, Your Honor, is in addition to that, not only relying upon that, is the absence, the conspicuous absence by Mr. Smith when given the opportunity to talk about the effect upon, after 10 years, what, okay, these are what the law is then. You're now stating what the law is, or at least what the defense counsel's state law is. Would you have insisted on going to trial? That exchange does not occur in this Federal evidentiary record. Why doesn't? Because he would not have changed his mind. There is the dogged insistence, as you find in the Langer v. Day case, another Montana death row inmate who insisted on pleading guilty and going to get into death penalty, the dogged insistence of pleading guilty for his own reasons, for his own volition. This holds a, casts a big shadow upon the analysis here, and is the reason why the State insists that had the proper advice been given, that Your Honor submits to him, submits the question as, he would have still insisted on pleading guilty. He did not want to spend any time in jail. He had a strong, persuasive, philosophical basis on why, that seeking to plead guilty was a type of freedom under his religious or philosophical beliefs. This is why the State maintains, with some force, that it would not have mattered, and why Judge Lovell, who expressly found that and made that statement, that it would not have mattered, why that has substance in the factual record. Counsel was quite gracious to say where you agreed and disagreed as you came into this, and this seems to me to be a sharp point of disagreement now as to the standard. If you're really looking at prejudice, and you're saying, well, he didn't say that he wouldn't have pled guilty. He didn't put it out there, not that he needs the magic words, but it's just not in the record in that way. Counsel is saying, well, essentially, he has said that in terms of, he thought he didn't have any options. So my question then becomes, under the Hill analysis, how much of our prejudice analysis is predicated on what he said or didn't say after the fact, and is that the end of the story, depending on which of these we credit, or is there more texture to the Hill analysis at this point? I wouldn't say there's more texture. The Hill analysis has remained since the time, essentially, this. You have to make some determination about the probability of the effect upon the alleged bad advice, the misadvice. What effect did that have upon the outcome of this proceeding? Recall that, unlike other Hill cases, where the defense counsel is advising or allegedly misadvising the client to plead guilty, Mr. Doran made the right advice, don't plead guilty. So in a way, this is unique consideration for this court. Mr. Doran was saying, don't plead guilty. He said so on the record. He was saying this against the grain. That is, I don't want to say it's standard advice, but it is in that circumstance. It's pretty standard advice, but then you usually go on when the guy says, look, I want to plead guilty, I want to plead guilty, I want the death penalty. Then isn't it incumbent on the lawyer to say, well, let me tell you why in your case, you know, given the alcohol use and the LSD and all this combination, you might not need to plead guilty to this and get the death penalty. You wanted a standard, strict analysis underlying Hill still applies. What did Mr. Doran know and when? And did he employ a reasonably professionally competent lawyer? We also need to ask, what should he have known? He could talk to Monroe and he would have found out the quantities of consumption. With respect, Your Honor, no. The record does not establish that. Petitioner's reply brief states that that establishes it, but it does not. There was an interview between Mr. Doran and Monroe,  that Monroe told him the quantity of LSD he had taken or the amount of beer ingested. It remains inconclusive from the standpoint of exactly what Mr. Doran knew based upon his conversations with Mr. Monroe. Mr. Monroe himself did not know. We're going to back, though, to the investigations. The client comes in and they tell you, well, you know, I was drinking with a couple of guys, with these buddies, and then I met these guys in the bar, and then we drove down here. So now you, I mean, you know that he's been drinking, and so you're saying, well, he just has to accept what Mr. Smith says as the baseline? He doesn't have any, no professional obligation in a death penalty case to go out and investigate that? Professional obligation is to render an adequate investigation. Adequate investigation. Not the most thorough investigation. But some investigation. Some investigation. On the liquor issue. Did he go to the bar and inquire there as to how much these guys had been drinking? The record does not reflect, Your Honor. Because it wasn't done. There's no suggestion that he did that, right? I'm sorry? There's no suggestion he actually went to the bar. No, there's no suggestion in the record, Your Honor. But this circuit and the United States Supreme Court has determined that the attorney may reasonably rely upon the statements of his client when that information is known to, the facts of the murder are known by two people, Monroe and Smith. And, of course, the victims who died. But Mr. Smith is told. Not necessarily in this case, though. I'm sorry? If you're investigating intoxication, the facts are known by other people, people at the bar, their other folks. So if you're investigating that as a possible defense, there are more than two people. Yes, Your Honor. But you would expect that Mr. Smith would bring forth those facts that substantiate his defense. He didn't know he had a defense, though. Your Honors, Your Honors, the outcome of the determination under Hill cannot rest upon probabilities alone. It cannot be what a more competent attorney would have done. It's what this counsel did do or should have done under the circumstances and under the facts known to him. He is going by what Mr. Smith told him was, I was not drunk or not to the extent that it affected the way I acted. Did Mr. Dorn reasonably rely upon that statement? Well, the precedent so far has been, yes, you can rely upon that. Was it required that Mr. Dorn or any counsel go in and every time talks to any client and suspect that the client is lying to them? There was no indication that Mr. Dorn swiftly stated that Mr. Smith was lying to him. He was straightforward. He was cool. He was intelligent. He was being up front. So if the premise is that an attorney cannot rely upon the statements, clearly stated statements of the client but must produce an independent investigation at odds with what your client is telling, there's no precedent supporting that position. Not in a strictly analysis. Do you know in the FBI 30-plus witness interviews if this issue was addressed with respect to level of intoxication? Yes, to the extent that those FBI statements would include the statements of the four Laramie County Cheyenne, Wyoming inmates to whom, to some degree or the other, Smith had confessed or acknowledged his guilt in the crimes. And the discussion of Mr. Smith to those inmates did not discuss his intoxication. In some respects, he said, I offed these two individuals, two victims at one state. So, yes, in the extent that the FBI statements of these inmates don't state intoxication at all. And this is completely in line with all the other evidence that has been stated up to the point where Mr. Smith chose to plead guilty was that as he stated under oath to Judge Keedy, he was not intoxicated to the extent that he did know and was not aware of what he was doing. The cases relied upon by my esteemed colleague about being on notice do not add up. Those cases cannot be read as cited in his brief that simply mere notice is enough. Those cases stand for, many of them in large part, mitigation investigation, which is a different jurisprudence. There is a stronger, more persuasive argument to be made. Yes, an independent investigation, even at odds with what your client is saying, is required. Yes, those cases do stand for that. That's mitigation. That is the penalty phase. There are not cases that state so in the guilt phase. And my time is almost up, and I would like to turn to the AEDPA procedural issue. Mr. Smith's 16 sentencing claims out of 1995 sentencing are time-barred. I'd like to address specifically, though, the argument that Felix, mail versus Felix from 2005 does not apply to Mr. Smith. For the sake of argument, let's say it does not apply. In the year 2000, when Mr. Smith's conviction was finalized, he was on notice that Rule 15C applies. Rule 15 relation back doctrine applies. That relation back doctrine has existed even before the promulgation of the Federal Rules of Civil Procedure in 1938, in some degree or the other. What is it that Mr. Smith is stating through this Court that immunizes him from 15C? Because even if this were a pre-AEDPA continuation or pre-AEDPA petition, when he filed what he deemed an amendment, did he expect that by simply denominating an amendment, it was thus so, by ibse dixit, that that declares it therefore is part of the proceeding as before? The State raised an objection to this in 2002 and stated that Rule 15C does apply. It does not relate back. It cannot relate back. So what is it that Mr. Smith had done if he thinks that Rule 15C does not apply to him? That then it would apply to anyone who afterwards here, if there's vacuture issued on his sentence, and he goes back for more sentencing, he could bring another one, another federal petition any time he pleased under the old habeas law pre-1996. There was not a statute of limitations per se. There was a laches argument. You had about five years, and then I think it was presumptively late after that, but it was a rebuttable presumption. The State's point is this. Regardless of the application of mail versus Felix, which certainly does apply, it doesn't excuse him from the relation back. And there is no relation back here, Your Honors, because it's not the 2002 petition, which Mr. Smith declared was his first habeas attack upon his death sentence in 1995, did not relate back to anything in the 1986 petition in terms of conduct, occurrence, or transaction. And even in Felix v. Mail, the litigants who did not prevail had argued that at minimum it relates back to the original petition, not the underlying facts as would occur in 1982. So it does not apply. Those arguments don't have merit. Slack v. McDaniel certainly applies. Judge Kennedy stated in terms of the certificate appealability requirement, regardless, he states in the third paragraph almost, expressed that regardless of when the petition is filed, whether pre-EDPA or post-EDPA, the appeal is a distinct action which requires under the EDPA, the petitioner must seek a certificate of appealability. And so that certainly does apply, Your Honor. Turning last to the so-called skipper issue and the proportionality evidence, the proportionality is mitigation evidence. Skipper does not, does not. Skipper supports the respondent's view as stated in the respondent's brief about the entire jurisprudence of mitigation evidence has to be constitutionally relevant mitigation evidence. Skipper spoke to the prospective ability of a person who was about to be sentenced to death, the prospects of behavior and character if he were granted life. That goes to a character issue. The proportionality as mitigation evidence that the defendant, that Mr. Smith applied here, has nothing to do with character or the offenses of the crime. Mr. Smith has abandoned his claims of proportionality as a proportionality claim itself. In other words, the Montana Supreme Court got it right, according to Mr. Smith, because he's not pursuing an habeas as far as the proportionality, the substantive proportionality argument. It certainly can't apply here. It has, it's not the entire universe of any possible means by which a jury or a fact finder can determine the sentence of life and death. For that matter, then, you can quote Albert Camus that stated that death penalty is barbarous. I heard counsel say it has to have a rational evidentiary relation. He didn't say any. So he grounded it in some foundation. Well, Your Honor, pretty much the characterization I heard of McCoy is that any possible, any possible relevant evidence as evidence. That's not the whole of your McCoy. No, but I think the argument fairly stated is that if you have states like Nebraska, which we prominently discussed today, and others that allow this kind of evidence, that it's within the universe of mitigation evidence that has been considered. Some other courts, Montana says any mitigation evidence comes in. That seems to be the argument in a nutshell. Yes, Your Honor. But those other states that are mentioned, it's constitutionally permissible for states to make determinations in their statutes that they allow this. No, but I think what his argument was that this is within the universe of mitigation. It's not so far out that no court has ever considered this as mitigation evidence. In fact, courts do. And I don't think the judge would have erred here, and I don't think you suggested the judge erred here, if he'd heard this evidence. Your Honor, I have four seconds. If I would complete this sentence. The proposition, the cases that are cited for this proposition of what you stated, fairly stated, the cases cited do not, they do not support that position because they deal with mostly almost entirely cases which co-defendants, co-defendants of the same underlying facts are considered, not defendants who have nothing to do with the facts underlying the crime. Thank you very much, Your Honor. May it please the Court. I just have a few comments to make. Counsel suggested that the Court should rely on the fact that my petitioner, when asked, said, oh, yes, back in 1983, I have been advised of the defenses. And I just want to make clear our response is that we can't expect that he knows what that means. He doesn't know what the defenses are. And when trial counsel is asked, and I know counsel addressed this, but it's at 648 to 650 of the excerpt of record. When trial counsel is asked specifically this question, what were the defenses that you told him about, the only thing he says after some colloquy, and it's a difficult answer to get out, is the possible complicity of Rod Monroe. And then when we look at the contemporaneous record of the letter, the letter of intent, the counsel himself drafted, we see that these defenses aren't mentioned. So we have a pretty good record, both from the hearing and contemporaneous, that this was not discussed. Judge Fletcher, you asked the question, was there any independent investigation? And, of course, counsel understandably was reluctant to answer it, but I'm not. There was none. He didn't even get an investigator. He didn't get a waiver from the client. The first thing a reasonably competent lawyer does is get a waiver. You go in that first meeting, you get a waiver. You're going to need all the records. He didn't get an investigator. The bar patrons weren't interviewed. The bar employees weren't interviewed. The people at the grocery store sold the beer weren't interviewed. There was no independent investigation, at least none to speak of. Let's turn to prejudice in Hill's sense. It's a little more nuanced than just would he have changed his plea. Part of it is what advice would have been given, and Hill has quite a bit of discussion about the fact that the outcome of the trial, the likely outcome of the trial, is an important part of that advice. It seems a little – it's a bit of a stretch to say that a competent attorney would say, I can win this case. I can get you down to mitigated deliberate homicide. I mean, it's tough. There are not many cases in which that kind of defense has worked. How do you address prejudice viewed through that lens? Yeah, through that lens. I tried to, obviously, inarticulately address it through that lens before, and let me try to be clear about the position. State v. Azure is a pretty close case. That case also dealt with a guilty plea, and defendant moved to withdraw the guilty plea saying, hey, I didn't know that there was a mitigated homicide defense. I was severely depressed and I was intoxicated. That's it, severely depressed and intoxicated. The Montana Supreme Court said that's enough. Counsel didn't advise you of that. You're entitled to withdraw your plea. Now, we have a similar situation. I agree with you. I'm hard-pressed to think a defense lawyer, and I think I mentioned this in response to you, Judge McKeon, I'm hard-pressed to think a defense lawyer, and I certainly wouldn't have gone in and said, we're going to walk you based on intoxication or mental health. I don't think you can say that. What I think you can say is, look, as we've done the investigation, there are statements about disassociative states, there are statements of blackouts, which we would know if he'd gotten the waiver and done the investigation. That's in the record. That goes directly to the question of whether you harbored the purposeful and the mental state elements for aggravated homicide. I think we might hang a jury, and I think we've got a good shot at mitigated homicide. That's what I think the advice would have been. Then you layer that on in terms of, well, okay, would that have affected him? And I think when a defendant says, I pled guilty because there were, quote, no other options, and I pled guilty because it was an automatic guilty, that when you say there were options, it wasn't an automatic guilty,  Well, if you take him at his word that he didn't want to spend time in prison, going to trial wouldn't have relieved him of that. He would have been guilty of mitigated deliberate homicide. Assuming away a hung jury, yes. Although a hung jury gets you a better offer. But the predicate of the question is he didn't want to spend any time in jail. That predicate I'm not willing to accept, and I don't think the record supports it. What he said was, hey, given what I was advised of, for each of the crimes, I don't want to spend that time in prison. But he didn't say, I don't want to spend another day in prison. That wasn't the rationale. I mean, if that were the case, then you would need to, even going to trial would be a problem for that because he's going to spend the time between then and trial in prison. So that wasn't the state of the record. And I short form my initial presentation because counsel suggested that the trial counsel was entitled to rely on his observations and what the client told him. And, of course, observations are an important part of the calculus. But let's keep in mind that two months before the guilty plea, the client had been referred to the jail psychiatric unit. And when defense counsel himself moved to withdraw the plea, I'm sorry, not withdraw the plea, to change the result from death to life, two months after the guilty plea had been entered, he filed an affidavit saying, by the way, he entered the guilty plea because he was severely depressed and I thought he might be mentally unstable due to the conditions. These were his observations. So with those observations in mind, is trial counsel on notice to do a mental health investigation? He certainly is, especially in a state like Montana where that can be a complete defense or even a mitigated homicide defense. There's no doubt that a reasonable lawyer operating under the Sixth Amendment dictates would have done this investigation. There shouldn't be any doubt of it. Unless the Court has any other questions, I'm prepared to submit it. Thank you, counsel. Thank you. I just wanted to say I think the argument from both counsels is going to end this morning. Thank you. Thank you, Your Honor. Yes, indeed. I want to thank everyone. You've all lived with this case a long time, and your presentation has been outstanding. Your briefs are excellent, and you have both of us, both of you have the appreciation. Thank you very much. Thank you, Your Honor. We'll be at recess. All rise.
judges: B. Fletcher, Thomas, McKeown